2010 Ark. App. 691

**Charlie L. JACKSON, Appellant**

v.

**SMITH BLAIR, INC. and Travelers Indemnity Company, Appellees.**

**No. CA 10–539.**

Court of Appeals of Arkansas.

Oct. 20, 2010.

Gregory Ross Giles, Moore & Giles, L.L.P., Texarkana, for appellant.

Nelson Vernon Shaw, Dodson & Dodson, L.L.P., Texarkana, for appellee.

RITA W. GRUBER, Judge.

Charlie Jackson appeals the Workers' Compensation Commission's decision of April 30, 2010, denying his claim for the compensability of a back injury he allegedly sustained at his workplace. He contends that the Commission erred in denying his claim based on the statutory presumption of Ark.Code Ann. § 11–9–102(4)(B)(iv) that his injury was caused by the use of illegal drugs. We affirm.

An injury is not compensable if "the accident was substantially occasioned by the use of alcohol, illegal drugs, or prescription drugs used in contravention of physician's orders." Ark.Code Ann. § 11–9–102(4)(B)(iv)(a) (Supp.2009). The phrase "substantially occasioned by the use" means that there must be a direct causal link between use of the substance and the injury. *Telling Indus. v. Petty*, 2010 Ark. App. 602, 378 S.W.3d 167. The presence of illegal drugs "shall create a rebuttable presumption that the injury or accident was substantially occasioned by the use" of illegal drugs; "to prove compensability, an employee has the burden to prove by a preponderance of the evidence that the illegal drug did not substantially occasion the injury or accident." Ark.Code Ann. § 11–9–102(4)(B)(iv)(b), (d) (Supp.2009). "Every employee is deemed by his or her performance of services to have impliedly consented to reasonable and responsible testing by properly trained medical or law enforcement personnel for the presence of any of the aforementioned substances in the employee's body." Ark.Code Ann. § 11–9–102(4)(B)(iv)(c) (Supp.2009).

Whether the intoxication presumption of Ark.Code Ann. § 11–9–102(4)(B)(iv)(b) is overcome is a question of fact for the Commission to determine. *Woodall v. Hunnicutt*, 340 Ark. 377, 12 S.W.3d 630 (2000). Our statute does not require that the Commission promulgate drug testing procedures or specify particular types of tests to be used as a precondition to the presumption; nor has our legislature required testing that would show a certain level of illegal drugs, as it has required to invoke the presumption in DWI cases. *Flowers v. Norman Oaks Constr. Co.*, 341 Ark. 474, 17 S.W.3d 472 (2000) (citing *Brown v. Alabama Elec. Co.*, 60 Ark.App. 138, 959 S.W.2d 753 (1998)).

In the present case, the Commission adopted and affirmed the opinion of the administrative law judge. The Commission first found that Jackson's own admission and a hair-follicle sample revealed the presence of marijuana in his system at the time of the alleged compensable event, thus raising the rebuttable statutory presumption that his injury was substantially

occasioned by his use of the illegal drug marijuana.

Next, the Commission examined the evidence to decide if Jackson had overcome the statutory presumption. It found that control, balance, and judgment were all factors that contributed to the claimant's alleged compensable fall on September 24, 2003; that these factors, which could be impaired with use of illegal drugs, had contributed to the injury; and that impairment of the three was attributable to use of illegal drugs. Additionally, the Commission found Jackson's post-accident actions regarding his drug test to be highly suspicious and found that Mr. Silvey credibly testified about Jackson's reporting he "could not perform a urine sample" at the first appointment. The Commission concluded that Jackson had not overcome the presumption.

Jackson testified at his hearing before the administrative law judge that the following events occurred on Wednesday, September 24, 2003, during the swing shift.[1] He was working as "shot blast" operator of a machine that cleaned watermeter-machine parts by blasting them with shot he described as akin to "millions of little b-bs." Small parts could be hung onto a "tree" that dragged them into the blasting machine, but 320–pound Jackson sometimes had to physically push larger parts in. His alleged accident occurred when he was handling a 300–to 400–pound coupling: he successfully pushed it into the machine and brought it out to turn it, but it "stalemated" when he tried to push it back in, and b-bs fell all over the floor. Jackson, who as an employee knew to be careful of slipping, indeed slipped on the shot. He felt his right leg "kind of split," lost his balance, and fell backward against some pallets. He did not report the incident that night, and there were no witnesses.

Jackson testified that he "hurt pretty good" but "kind of blew it off" because the accident happened shortly before his last break and his 11:00 p.m. quitting time. He told his wife about it but told her he thought he was okay. He soaked in a hot tub, he was hurting, and his wife put "rub" on him. Although on Thursday morning his pain was "kind of severe," he again blew it off and went to work at 2:30 p.m., limping a bit. He reported the incident to his supervisor, Derrel Walraven, and left work after Walraven filled out an accident report. There was no mention of a drug test at the time, but an appointment with a Dr. Stussy was set up for the next day, a Friday.

Jackson stated that he went to the appointment around 2:30 p.m., waited until he saw a nurse practitioner, and was prescribed muscle relaxers and pain pills. He could not urinate when he was asked to give a urine sample for drug testing, so Smith–Blair's human resource manager, John Silvey, brought Gatorade to him and sat with him while he drank it. The doctor's office was closing by then, and Jackson left without producing a sample. Monday morning Silvey instructed Jackson to go to the office of company doctor Mark Gabbie; Jackson arrived there ready to give a urine sample but learned that Silvey wanted a hair sample instead. The hair was taken and Jackson went to his shift; he stayed only about thirty minutes because of pain in his right leg and lower back. About a week after the accident, Silvey informed him that he was being terminated from employment because the hair-follicle test was positive for marijuana.

---

1. The record before us does not explain why six years elapsed between the alleged date of injury and the September 29, 2009 hearing.

Jackson denied using marijuana the day of the accident or being under its influence when the accident occurred. He explained that three or four weeks previously, he had unwittingly eaten marijuana-laced brownies that a Chicago cousin brought to a family gathering after their grandmother's death. Jackson said that Silvey and another supervisor thought this story was "a joke" when he told it to them. Finally, he testified that his leg pain and spasms had never left although he had seen doctors and physical therapists at various times in the last years.

Jackson admitted on cross-examination that there was "very little" marijuana in his system, but referred again to unknowingly eating marijuana-laced brownies. He testified that he was on his wife's health insurance, had followed her suggestion to see a pain specialist two years after seeing his other doctor, and in 2006 had begun getting social security disability. He said that he had undergone a required physical examination with drug testing before his employment began at Smith–Blair. He said that his union had an agreement with Smith–Blair requiring company employees to abide by reasonable work rules and drug policies, and he acknowledged his signature on Smith–Blair rules prohibiting an employee from having "any kind of drug or alcohol in his or her system." He said there had been no random drug testing in all his years at the company, but he recalled a meeting in July 2003 about drug use in the workplace.

Evidence considered by the Commission included a letter from Silvey to Jackson, terminating employment for violation of the company's drug-testing policy; a positive lab report from Quest Diagnostics showing .1 pg/mg of marijuana metabolites in Jackson's hair sample; accompanying literature from Quest; Jackson's medical records;[2] and Dr. Gabbie's deposition testimony. Quest's literature included information on the appropriateness of various testing methods:

> Drugs in the bloodstream are able to incorporate and bind to the hair follicles underneath the scalp. It takes approximately 3–10 days for hair containing drug to reach the outer environment on top of the scalp to be collected based on the average rate of head hair growth.... Urine is useful for detecting recent or new drug use (last 1–3 days except Marijuana which is longer) and hair for providing an approximate three-month drug history.
>
> ....
>
> Because *Hair testing* detects drug use over a long period of time, usually around 90 days, it *is not an appropriate method for post-accident or reasonable suspicion testing.* In both of these situations, the drug testing procedure should detect the drug use of an individual as close as possible to the time of the incident. However, hair tests are appropriate for random testing protocols-especially if hair was used for the pre-employment test or the employee has been working for more than 90 days.

(Emphasis added.)[3]

John Silvey testified that the purpose of the July 2003 meeting with all employees

---

**2.** The medical record from Dr. Stussy's clinic of Friday, September 26, 2003, shows Jackson's complaint as "some back pain"; it states that he "has some periodic back pain, ... does a lot of heavy lifting all day, ... and denies any specific injury." Also in the record is a neurosurgeon's 2007 recommendation for surgical decompression at L5 and a 2009 "impairment medical evaluation" referencing a November 11, 2003 MMI finding degenerative disease diffused in Jackson's lumbar spine.

**3.** We do not know precisely the weight the Commission gave to the accompanying litera-

was to mandate drug testing for any job injury, and he testified about getting Jackson tested after his alleged accident. Jackson was sent to Dr. Stussy on Friday because Dr. Gabbie, the company doctor, was not able to see him. An employee at Dr. Stussy's office telephoned Silvey to report that Jackson had arrived but was upset about having to take a drug test. Silvey told Jackson over the phone there was no choice because the accident report would be filed as workers' compensation. Jackson replied that he did not want it filed and that Silvey knew about Jackson's past back problems. Dr. Gabbie's employee telephoned twenty minutes later that Jackson still did not want to be tested. When Silvey again told Jackson that he had to, Jackson said he could not urinate but Gatorade might help. Silvey took Gatorade to the clinic and Jackson drank it, but after 5:00 it was "obvious" that Jackson would not be giving a sample.

Silvey testified that on the following Monday he explained Friday's events to Dr. Gabbie's lab technician, who said that Dr. Gabbie's protocol when someone did "not take the test" was to do hair-follicle testing. Silvey checked Smith–Blair's policy,[4] found that any type of testing was allowed, and ordered the hair-follicle test. Silvey subsequently informed Jackson of the positive results and set up a meeting with Jackson and his union representative. Jackson then told Silvey about eating the brownies and asked that drug rehabilitation be considered, but Silvey informed him that company policy allowed rehabilitation only if a person came forward before positive test results.

On cross-examination Silvey testified that Jackson did a good job at Smith–Blair, said that the alleged accident could have happened just as Jackson described it, and stated that no employee or supervisor said Jackson had been intoxicated or acting in an unusual fashion. Smith–Blair stipulated that an employee was present to testify that Jackson "was not intoxicated or did not appear to be intoxicated" at the time of his alleged injury.

Dr. Gabbie testified in his deposition that his lab technician would have taken Jackson's hair sample by the process specified in Quest's literature and that the laboratory results showed the presence of marijuana metabolites. Dr. Gabbie acknowledged that the test did not quantify the amount present, quantify the amount used, specify the time of use except that it was within ninety days, or indicate whether Jackson had been inebriated or using marijuana such to have affected his work performance five days before testing.

*Point on Appeal*

Jackson contends that the Commission erred in denying his claim based on the statutory presumption that his injury was caused by use of illegal drugs. He argues that the presence of marijuana metabolites in his hair sample was not evidence of the presence of marijuana, that the Commission ignored evidence to the contrary, and that no evidence supported a finding that drug testing and Jackson's own admission

---

ture from Quest because it was not mentioned in the findings of fact and conclusions of law.

4. The company's drug and alcohol policy, in part, prohibits employees from being at work or operating company equipment under the influence of illegal drugs, which occurs "if drug test results indicate the presence of an illegal drug or controlled substance in the

employee's system in an amount that constitutes a positive test result." Positive means the test result shows either "the presence of an illegal drug or controlled substance *in the employee's system* at or above a threshold level set by the laboratory that conducted the test" or .05 percent blood-alcohol for an employee or job applicant. (Emphasis added.)

showed marijuana to be present in his system at the time of his injury. He asserts that the statutory presumption did not arise in this case and that, even if it did, he overcame it through his credible testimony of the remoteness in time of his ingesting marijuana, stipulated testimony confirming that he was not impaired on the day in question, and Silvey's admission that the accident could have happened just as Jackson said.

It is the function of the Commission to determine the credibility of the witnesses and the weight to be given their testimony. *Jordan v. Tyson Foods, Inc.,* 51 Ark.App. 100, 911 S.W.2d 593 (1995). The Commission is not required to believe the testimony of the claimant or any other witness, but may accept and translate into findings of fact only those portions of the testimony it deems worthy of belief. *Id.*

The Commission found that Jackson's admission of marijuana use in the time period tested and the lab report that marijuana metabolites were present in his hair sample raised the statutory presumption that his injury was substantially occasioned by his use of illegal drugs. Our case law clearly states that the presence of marijuana metabolites is evidence of the presence of marijuana. In *Waldrip v. Graco Corp.,* 101 Ark.App. 101, 105, 270 S.W.3d 891, 895 (2008), we explained:

> This court has previously concluded that testing positive for marijuana metabolites is sufficient to establish a rebuttable presumption that the employee's injury was substantially occasioned by the use of marijuana. *Wood v. West Tree Service,* 70 Ark.App. 29, 14 S.W.3d 883 (2000); *see also Flowers v. Norman Oaks Constr. Co.,* 341 Ark. 474, 17 S.W.3d 472 (2000) (noting that both the Arkansas Supreme Court and this court have held that the presence of drugs or alcohol established only by metabolites

or a slight amount of drugs or alcohol was sufficient to raise the rebuttable presumption and shift the burden of proof to the claimant to rebut the presumption). Moreover, in this case, appellees' expert witness testified that the levels of metabolites in appellant's urine demonstrated that appellant had the THC active compound in his blood. Accordingly, we are compelled to conclude that the rebuttable presumption was created.

*See also Flowers, supra; Wood v. West Tree Service,* 70 Ark.App. 29, 14 S.W.3d 883 (2000); *Hickey v. Gardisser,* 2010 Ark. App. 464, 375 S.W.3d 733 (discussing the language of the statute).

Jackson directs our attention to the viewpoint of the dissent in *Waldrip,* that "[n]either proof of past illegal drug use nor the presence of a metabolite is sufficient to invoke [the] presumption." 101 Ark.App. 101, 108, 270 S.W.3d 891, 896. Jackson relies upon his own story and evidence about the purpose of hair-follicle testing as proof that he overcame any presumption that the presence of marijuana substantially occasioned his accident and injury. We comment only that dissenting opinions have no precedential value, and that it is the Commission's province to decide the weight and credibility of the evidence before it.

We reject Jackson's premise that there was no presumption that his injury or accident was substantially occasioned by the use of illegal drugs, and we find substantial evidence to support the Commission's finding that he failed to overcome the presumption. The Commission's decision displays a substantial basis for the denial of this claim, and we affirm.

Affirmed.

ROBBINS, J., agrees.

HART, J., concurs.